**MORLEY–MURPHY COMPANY,**
Plaintiff,

v.

**ZENITH ELECTRONICS CORPORATION,**
Defendant.

No. 95–C–255–C.

United States District Court,
W.D. Wisconsin.

Jan. 5, 1996.

W. Stuart Parsons, Quarles & Brady, Milwaukee, WI, for Morley–Murphy Company.

Michael A. Bowen, Foley & Lardner, Milwaukee, WI, for Zenith Electronics Corporation.

## OPINION AND ORDER

CRABB, Chief Judge.

Under the Wisconsin Fair Dealership Act, §§ 135.01–.07, a grantor cannot terminate a dealership agreement without "good cause," which is defined in the statute as either bad faith on the part of the dealer or

> failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed upon him by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

Wis.Stat. § 135.02(4). This civil action for monetary relief turns on the meaning of "good cause" as it applies to defendant Zenith Corporation's termination of its dealership relationship with plaintiff Morley–Murphy Company.

The case is before the court on the parties' cross motions for summary judgment. Defendant is contending that it had good cause under the statute for terminating its dealership with plaintiff because the termination was part of a basic, system-wide change in its method of doing business and represented an essential, reasonable and non-discriminatory attempt to stem substantial and continuing economic losses. Plaintiff is asserting that good cause cannot be read to encompass a termination undertaken simply to improve a grantor's financial performance when the grantor continues to market its products in plaintiff's former distribution territory.

I conclude that plaintiff is correct. Neither the language nor the purposes of the fair dealership law support defendant's interpretation of good cause as it would apply to this case. Accordingly, plaintiff is entitled to judgment as a matter of law on its claim that defendant violated the Wisconsin Fair Dealership Law when it terminated its relationship with plaintiff. Trial will be limited to determining the damages owing to plaintiff as a result of defendant's violation.

I find from the parties' proposed findings of fact that there is no genuine dispute about the following material facts.

## UNDISPUTED FACTS

Plaintiff Morley–Murphy is a Wisconsin corporation with its principal place of business in Green Bay, Wisconsin. Defendant Zenith Electronics Corporation is a Delaware corporation with its principal place of business in Glenview, Illinois. Until January 1, 1995, plaintiff served as a distributor of defendant's consumer electronic products pursuant to a series of annual distributor agreements, the last one of which expired by its terms on December 31, 1994. By letter dated December 27, 1994, defendant advised plaintiff "of Zenith's intent to change its method of distribution, which will result in termination of the relationship between Zenith and Morley–Murphy." It was defendant's intent to distribute directly to the retail community, restructuring its sales and distribution function during the first half of 1995. Defendant offered to extend the terms of the parties' 1994 agreement and to continue to supply plaintiff with products through June 30, 1995, but advised plaintiff that their relationship would be terminated no later than that date. Plaintiff did not respond directly to the offer to extend the terms into 1995 but requested a meeting with defendant to determine whether there was any way to save the dealership.

Plaintiff is a diversified company engaged in distribution activities and commercial leasing and franchise hotel operations. As a distributor, plaintiff has not confined itself to defendant's products alone, but has carried electrical products, plumbing supplies, lawn mowers and generators. In 1994, the Zenith business amounted to 54% of plaintiff's total distributing business and was plaintiff's largest merchandising line. Plaintiff's longstanding relationship with defendant has allowed plaintiff the financial base necessary to take on new lines and develop them into profitable segments.

As long as plaintiff served as a Zenith distributor, its distribution headquarters and base of operations were located in Green Bay, Wisconsin, and its distribution area for Zenith consumer electronic products included most of Wisconsin and the Upper Peninsula

of Michigan. In 1993, plaintiff took over distribution of defendant's products in Iowa, western Wisconsin, Minnesota, North Dakota and South Dakota. Plaintiff has made capital and financial investments in inventory, facilities, personnel and other distribution infrastructure to carry out its distribution obligations.

During its 58–year relationship with defendant, plaintiff identified itself closely with defendant. The name Morley–Murphy was synonymous with Zenith in the Milwaukee and Green Bay areas. Plaintiff has made significant investments in advertising and promoting defendant's products: it has paid the cost of advertising defendant's products, distributed Zenith decals for dealers' trucks, sponsored joint training sessions and open houses with defendant for dealers and sent letters to dealers with both Morley–Murphy and Zenith logos on the letterhead.

For almost three decades, real prices among domestic television manufacturers have declined steadily and profit margins have turned into losses. Although defendant has not experienced losses in each of the last 30 years and did have good years and quarters during that time, it reported an overall net operating loss in 9 of the last 10 years. In the last five years defendant has lost over $320 million, with an overall net operating loss of $60.8 million for the first two quarters of 1995. Although 1994 was one of the best unit volume years the American television industry has had in a long time, defendant had a net operating loss of $11 million. It has survived this long-term string of losses by cutting costs aggressively through plant closings and layoffs and by borrowing money and selling assets.

In the late 1950s and 60s, defendant distributed its product through more than 70 independent distributors. At that time, almost all televisions were sold through small "Main Street" electronics stores and a few department stores. Independent distributors ordered and inventoried products and delivered them to the retail dealers. Since 1986, large discount consumer electronics retailers such as Circuit City, Sears, Best Buy and American TV have greatly increased their market share of television sets. Many of these large retailers have their own distribution centers and have taken over inventory management functions that the independent distributors handled in the past. In 1989, defendant started selling directly to Sears, Circuit City and other large retailers. Many of these large retailers insist on dealing directly with manufacturers regarding price and other economic terms. However, plaintiff continued to deal directly with several large discount electronic retailers, including American TV.

By 1994, direct sales to large national retailers accounted for almost half defendant's sales volume and defendant's 15 remaining independent distributors accounted for only about 21% of defendant's color television sales volume. Defendant subsidized the resale pricing of its remaining distributors through extra discounts that cost defendant millions of dollars a year. These special promotional allowances enabled plaintiff to sell more of defendant's products and to provide defendant with a larger market share and more revenue.

Over the last ten years, many electronics retailers have joined national buying groups that offer to purchase large quantities of product from a manufacturer in exchange for special pricing and other consideration. The buying groups seek to use the collective buying power of their members. Most independent dealers in Wisconsin do not belong to buying groups: as of June 30, 1994, fewer than 95 of the approximately 600 independent retail dealers to whom plaintiff sold Zenith products purchased defendant's products through buying groups.

In part because of the competitive nature of the color television industry, the growth of national and regional discount consumer electronics retailers and the resulting decrease in profit margins, many of defendant's independent distributors have left the business. By 1994, defendant had only six company-owned and 15 independent regional distributors. The independent distributors assumed the cost of the warehousing and shipping to dealers, incurred the expense of a sales force and paid defendant immediately for the product.

During the summer of 1993, defendant organized a task force to study its sales and distribution system by exploring ways to restructure defendant's customer base, reduce overhead and logistical costs, improve service levels and identify volume opportunities. By February 1994, the task force had reached the tentative conclusion that defendant could save substantial amounts by converting to one-step distribution in which the product is shipped directly from defendant to the retailers' warehouses. The substantial savings the task force identified took into account the centralization of inventory and elimination of defendant's own distribution organizations and did not separately analyze the financial impact of terminating defendant's independent distributors. In November 1994, defendant made a final decision to implement one-step distribution in areas served by its independent distributors, effective no later than July 1, 1995.

On March 16, 1995, the parties met in an attempt to avoid litigation on plaintiff's claim that defendant was terminating plaintiff's dealership wrongfully. Plaintiff's counsel opened the meeting by stating that his purpose was to discuss settlement and that statements made at the meeting would be statements made in compromise negotiations. Defendant's counsel agreed that the meeting was a settlement conference. At the meeting, both sides talked about the expense and aggravation of litigation and the desirability of resolving their dispute. Plaintiff presented a settlement demand at the meeting that was prepared by a financial consultant retained to analyze plaintiff's financial performance and future as a Zenith distributor. Near the end of the meeting, defendant asked whether plaintiff would consider doing business with defendant other than as a full-line distributor. Asked to clarify, defendant referred to the "premium business" that included television sets sold to companies who use them as premiums or gifts in programs for employees or customers. Because of the small size of such business, plaintiff did not even consider this offer and told defendant it was not interested in the premium business alone.

On March 30, 1995, defendant sent plaintiff a letter formally terminating plaintiff as a Zenith distributor, effective June 30, 1995. The notice provided no cure period of sixty days, no notice of any deficiency that plaintiff could cure within a sixty-day cure period, and no identification of any failure by plaintiff to comply substantially with essential and reasonable requirements imposed upon plaintiff by defendant or sought to be imposed by defendant. Defendant's termination of plaintiff as a distributor had nothing to do with its performance. In fact, plaintiff performed well as a Zenith distributor.

In a meeting in April 1995, defendant told plaintiff that defendant could not offer plaintiff any settlement alternatives that included its continuation as a full-line Zenith distributor or a comparable role and that the matter would have to be resolved in court.

Defendant terminated plaintiff as part of a system-wide, non-discriminatory change from two-step to one-step distribution intended to stem overall losses and improve financial performance by improving efficiency and the ability to respond to the demands of large retail buyers and by eliminating subsidies to distributors such as plaintiff. Defendant never performed a profitability analysis that analyzed profitability in various geographic areas of the country, such as by region. When defendant terminated plaintiff, it had "no idea" whether independent distribution by plaintiff in the upper midwest might have been more profitable than not. Defendant has not identified any increase in revenue resulting from the shift to one-step distribution.

Upon termination of plaintiff's dealership, defendant has taken over sales to retail accounts in what were formerly plaintiff's primary areas of responsibility. Defendant has not withdrawn from such areas but has organized a sales force to sell as many Zenith products in plaintiff's former areas as it can.

## OPINION

### A. *Good Cause*

The parties' "good cause" dispute focuses on three cases. Plaintiff argues that the decision in *Kealey Pharmacy & Home Care*

*Services, Inc. v. Walgreen Co.,* 539 F.Supp. 1357 (W.D.Wis.1982), *aff'd,* 761 F.2d 345 (7th Cir.1985), and Judge Shabaz's decision in *Slowiak v. Hudson Foods, Inc.,* 1992–1 CCH Trade Cases ¶ 69,821, 1992 WL 176983 (W.D.Wis.1992), *aff'd on other grounds,* 987 F.2d 1293 (7th Cir.1993), warrant a finding that defendant's economic circumstances alone cannot amount to good cause for termination of the relationship between the parties when defendant continues to market its products in plaintiff's former distribution territory. Defendant counters that the decision of the Supreme Court of Wisconsin in *Ziegler Co. v. Rexnord, Inc.,* 147 Wis.2d 308, 433 N.W.2d 8 (1988) (*Ziegler II*), controls and permits defendant to terminate its relationship with plaintiff consistently with the fair dealership act because defendant's own financial concerns made the decision essential and reasonable. A synopsis of the three cases will help to define the dispute.

In *Kealey,* 539 F.Supp. 1357, defendant Walgreen had terminated its dealerships with independent drug stores selling Walgreen brand products because the independent stores were "producing an inadequate rate of return." *Id.* at 1361. It continued to operate its company-owned stores in Wisconsin. Walgreen made the same argument defendant is making, that the fair dealership law's good cause standard does not apply to statewide terminations of dealerships effected for legitimate business reasons. In rejecting that argument, I noted that the law defines good cause solely in terms of dealer deficiencies and that the statute's stated purpose and legislative history reflected a judgment on the part of the legislature to protect Wisconsin dealers. *Id.* at 1367 (legislature "believed that only the threat of a civil action for money damages or injunctive relief would give sufficient support to a dealer's bargaining position to allow the dealer to negotiate a fair termination agreement"). The Court of Appeals for the Seventh Circuit upheld this decision, finding that defendant Walgreen's own economic concerns did not constitute good cause because the statute defines good cause only in terms of dealer-related deficiencies. *Kealey,* 761 F.2d at 350. The court of appeals noted the statute's references to fairness in § 135.025(2)(a) and (b) (purpose of

act is promotion of "the compelling interest of the public in fair business relations between dealers and grantors," the "continuation of dealerships on a fair basis" and the protection of "dealers against unfair treatment by grantors who inherently have superior economic power and superior bargaining power in the negotiation of dealership"). The court concluded that it was not contrary to those purposes to allow an award of damages against Walgreen. Such a result would advance the act's intent to prohibit a grantor from usurping the goodwill the independent dealers had developed for the grantor's products. *Id.*

In *Ziegler II,* 147 Wis.2d 308, 433 N.W.2d 8, the state supreme court gave the concept of good cause a broader interpretation. The defendant grantor had informed the plaintiff dealer that it would not renew their distributor agreement in its current form and offered the dealer a new agreement that the court characterized as "quite similar" to the old agreement. *Id.* at 312–13, 433 N.W.2d at 10. The grantor argued that it had proposed the new agreement with its dealers in order to stem "ruinous losses." *Id.* Although the court concluded that disputed factual issues precluded a grant of summary judgment for either party, it held that on remand the trier of fact could consider the grantor's economic circumstances to determine whether the changes the grantor attempted to institute before terminating the relationship were "essential and reasonable." *Id.* at 316–21, 433 N.W.2d at 11–14. In allowing the grantor's perspective to be considered, the court focused on the phrase "sought to be imposed" in the statute's definition of good cause, § 135.02(4)(a), noting that this phrase "suggests legislative recognition that the grantor has some ability to change the dealership— some right on the part of the grantor to change its method of doing business with its dealers." *Id.* at 317, 433 N.W.2d at 12. The court held that "the grantor may terminate, cancel or fail to renew a dealership if the dealer refuses to accept proposed changes in the dealership relationship provided that the changes ["sought to be imposed"] are essential, reasonable and not discriminatory." *Id.* The court noted that what is essential and

reasonable must be determined by the trier of fact on a case-by-case basis after balancing the relative interests of both parties.

In *Slowiak*, 1992 WL 176983, the defendant grantor terminated the dealer solely because the grantor was changing its overall distribution system to a warehouse system. *Id.* at *3. The grantor continued to service the accounts previously served by the dealer without offering the dealer the opportunity to participate in the new warehouse system. In finding a violation of the fair dealership law, Judge Shabaz refused to apply the *Ziegler II* analysis to a situation in which the relationship between the parties is terminated unilaterally by the grantor for its own economic reasons rather than because of some failure on the dealer's part. In order to do so, he would have to ignore the statutory definition of good cause, which is limited to "some action or inaction taken by the dealer, not the economic motivations of the grantor." *Id.* Judge Shabaz held that the focus on the grantor's economic circumstances in determining good cause is applicable only where the "cause" for the termination of the relationship is the dealer's rejection of the grantor's proposed changes in an ongoing business relationship. *Id.* at *8 (*Ziegler II* analysis relevant "only where a grantor seeks to impose new requirements on a dealer, not where the grantor flatly terminates a dealer").

Denying that *Kealey* and *Slowiak* apply to the facts in this case, defendant argues that *Slowiak* is distinguishable because the undisputed facts show that defendant did offer plaintiff a continuing business relationship before formally terminating the dealership and that this offer is not excluded as an "offer of compromise" under Fed.R.Evid. 408. Thus, defendant contends, *Ziegler II* and its focus on defendant's economic concerns should apply. Defendant argues that *Ziegler II* should be read to apply to instances in which the change the grantor seeks to impose in the parties' relationship would amount to termination of the dealership; limiting *Ziegler II* to instances in which the grantor first offers the dealer some continuing dealership relationship is simply arbitrary line drawing that does not take into account the concern for general fairness between grantors and dealers evident throughout the state court's opinion. In defendant's view, *Ziegler II* reflects the state supreme court's approval of the market withdrawal line of cases in which courts have recognized an exception to the good cause requirement for terminating dealerships in those situations in which the grantor withdraws from the market previously served by the dealership. *See St. Joseph Equipment v. Massey-Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis. 1982); *Lee Beverage Co. v. I.S.C. Wines of California*, 623 F.Supp. 867 (E.D.Wis.1985). The exception is based in part upon constitutional concerns associated with penalizing a grantor for market withdrawal. *St. Joseph Equipment*, 546 F.Supp. at 1248, *Lee Beverage*, 623 F.Supp. at 869, n. 1. Defendant contends that this approval demonstrates that the court was rejecting a rigid text-bound approach to the fair dealership law. Application of *Ziegler II* to the undisputed facts, defendant contends, shows that its own decision to move to direct distribution and terminate plaintiff's dealership was 1) non-discriminatory, because the change to direct distribution was effected system-wide; 2) reasonable, because defendant studied its distribution system thoroughly before making the decision to terminate plaintiff, gave plaintiff over six month's notice of the upcoming termination and offered to continue the relationship an additional six months; and 3) essential, because defendant's termination of plaintiff was one of a long line of changes defendant has implemented to stem the overall losses it has incurred in nine of the last ten years as the shift in the retail television market to large retailers and national buying groups has eliminated the need for "middle-men" such as plaintiff.

■ As a preliminary matter, I conclude that defendant's offer of the premium business and plaintiff's subsequent rejection of that offer at the parties' March 1995 meeting would not be excluded at trial under Fed. R.Evid. 408 and can be considered for the purpose of summary judgment. *See* Fed. R.Civ.P. 56(e); *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1204 (7th Cir.1995) ("materials submitted for summary judgment must be otherwise admissible" in trial).

First, it is clear that the premium business offer was an offer to compromise plaintiff's claim rather than a business proposal. It is undisputed that plaintiff's purpose in attending the meeting was to negotiate a fair termination of its dealership, that defendant's counsel agreed the meeting was a "settlement conference" and that both parties discussed their desire to avoid litigating the dispute and tried to settle the dispute at the meeting. Defendant had made up its mind in November 1994 that it would terminate plaintiff's dealership. Its offer was an attempt to effect that termination on terms acceptable to both parties. In short, Rule 408 must be considered.

Rule 408's exclusion of compromise offers is based upon two main rationales: 1) the evidence of an offer to compromise is irrelevant because it may be motivated by the offeror's desire for peace rather than from any concession that its position is weak; and 2) exclusion advances the public policy favoring the compromise and settlement of disputes. *See, e.g., Quad/Graphics, Inc. v. Fass,* 724 F.2d 1230, 1235 (7th Cir.1983). In this instance, the dual rationales for exclusion are not implicated because defendant is offering in evidence its own settlement offer rather than an offer by the opposing party. *See Crues v. KFC Corp.,* 768 F.2d 230, 233–34 (8th Cir.1985) (use by offeror to show unreasonableness of recipient not excluded by Rule 408 because rule concerned with "excluding proof of compromise to show liability of the offeror"); 23 Charles Alan Wright & Kenneth Graham, *Federal Practice and Procedure* § 5308 at p. 243 (1980) (prohibiting use by party of its own compromise offer on the basis of Rule 408 "makes little sense" because the policy of encouraging settlement offers is not implicated). Moreover, defendant is not offering evidence of its settlement offer as circumstantial evidence of plaintiff's belief in the validity of its claim but as proof of plaintiff's rejection of defendant's offer, a rejection that has potential implications in light of the fair dealership law's focus on dealer-related deficiency and the *Ziegler II* decision. Defendant is offering the evidence to show that it terminated its relationship with plaintiff because of plaintiff's refusal to agree to an offer to alter that relationship. Thus, even if Rule 408 were applicable to evidence of offers adduced by the offeror, the evidence would be admissible under the last sentence of Rule 408, because it is "offered for another purpose" than the one proscribed by Rule 408: defendant is offering the evidence to rebut plaintiff's claim that its dealership was terminated without good cause. *See Breuer Electric Manufacturing v. Toronado Systems of America,* 687 F.2d 182, 185 (7th Cir.1982) (settlement evidence properly presented to rebut defendant's assertion that it was unaware of plaintiff's claim); *Thomas v. Resort Health Related Facility,* 539 F.Supp. 630, 638 (E.D.N.Y. 1982) (settlement offer admissible on issue of mitigation of damages).

Although defendant's premium business offer distinguishes this case from *Slowiak,* the change defendant "sought to impose" in the business relationship between the parties is not like the change proposed in *Ziegler II;* defendant's proposed change would have terminated plaintiff's dealership entirely. Defendant does not rebut plaintiff's characterization of the premium business as insubstantial or contend that the business was comparable to the parties' dealership relationship. Defendant did not terminate the dealership because of plaintiff's rejection of the premium business, it terminated the dealership and took over the market that plaintiff had developed because of its own economic concerns. Defendant's settlement offer was simply window dressing for actual dealership termination. In contrast, in *Ziegler II,* the grantor was seeking to make changes in the parties' business relationship that the court characterized as leading only to a relationship that could be less lucrative for the dealer. The court stated explicitly that the case did not "involve a termination," 147 Wis.2d at 322, 433 N.W.2d at 14, and that a grantor can terminate a dealership if "the dealer refuses to accept proposed changes in the *dealership relationship* provided that the changes are essential, reasonable and not discriminatory." *Id.* at 317, 433 N.W.2d at 12 (emphasis added). The court did not characterize the proposed changes as terminating the dealership relationship between the parties or representing less than a roughly equivalent role

for the dealer in the market it had serviced and helped to develop.

Despite this distinction, defendant argues that *Ziegler II* indicates the state supreme court's willingness to read the good cause provision to accommodate a grantor's economic concerns even in cases in which the changes the grantor seeks to impose include termination of the dealership relationship. In essence, defendant contends that plaintiff's failure to agree to the smaller, non-dealership role sought by defendant created "good cause" for defendant to terminate the dealership unilaterally. Defendant is giving too broad a reading to *Ziegler II* and what is included within the statutory phase "sought to be imposed." The distinction between proposed changes that would result in outright termination of the dealership and changes resulting in minor alterations of the existing dealership relationship is important because of the statute's concern for protecting dealers, as evidenced by the good cause focus on dealer-related deficiencies.

Although *Ziegler II* expressed approval of the market withdrawal exception to the good cause provision, the court framed its analysis within the "sought to be imposed" language of the good cause statute. Defendant's argument that grantors can seek to impose outright termination on dealerships stretches the phase "sought to be imposed" to the logical breaking point and effectively reads out of the statute the protection of dealers that is the purpose of the fair dealership law. As the court of appeals recognized in *Kealey*, 761 F.2d 345, the statute was "intended 'to protect the thousands of small businessmen in Wisconsin who are franchisees.'" *Id.* at 349 (quoting *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60 (1981)); *see also Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir.) ("The statute's main purpose is to give dealers a kind of tenure—like federal judges, or teachers, or workers in establishments covered by collective bargaining contracts."), *cert. dismissed*, 479 U.S. 925, 107 S.Ct. 333, 93 L.Ed.2d 345 (1986); *see also Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 137 (7th Cir.1990), in which the court of appeals addressed a similar good cause provision in Indiana law and noted that allowing good cause for termination to include a grantor's internal economic concerns would directly contravene the good cause provision's purpose to "ensure fair dealing between the parties;" the protections of the dealership statute would be meaningless if the business reasons of the grantor were sufficient to constitute good cause because grantors could "virtually always claim a plausible business reason for termination" and "[w]ithout a smoking gun, it would be difficult, if not impossible, for a [dealer] to prove that a particular action is not in the business interests of the franchisor." *Id.* at 137–38.

Although *Wright–Moore* did not involve the Wisconsin Fair Dealership Law, the court's concerns are equally applicable to cases brought under the Wisconsin law. Defendant is asking the court to find good cause for defendant's termination of plaintiff's 58-year dealership because plaintiff refused to accept "essential and reasonable requirements" sought to be imposed on it by defendant. Defendant supports the necessity and reasonableness of the requirements by alleging that it has lost money in nine of the last ten years, that it had "studied" its overall distribution system and that it had determined that eliminating its middle layer of distribution would increase its financial performance. Defendant offers no tangible proof that its specific business dealings with plaintiff were unprofitable; it concedes it did not specifically consider plaintiff's role in marketing its electronic products; it did not find that plaintiff was no longer serving a valuable role; and it does not contest plaintiff's contention that much of the savings defendant will realize under a one-step distribution system will be from its own internal changes and not from the elimination of plaintiff's dealership. Defendant argues that it did not have to do a dealer-by-dealer breakdown to know that it must be losing money under its current distribution system in view of nationwide market changes.

■ Accepting defendant's argument that it had good cause to terminate plaintiff would eviscerate the Wisconsin Fair Dealership Law. It would allow any supplier that alleged economic loss the ability to terminate

its Wisconsin dealers unilaterally and take over the market the dealers had developed, provided only that the supplier could show it had "considered" the problem and had come to believe a broad structural change would serve to stem its losses. The law would no longer provide the protection from opportunistic behavior on the part of grantors that is memorialized in the good cause provision's focus on dealers' performance deficiencies. *See, e.g., Remus,* 794 F.2d at 1240 ("Just as in the employment setting the term "good cause" refers to deficiencies in the employee's performance, so in the Wisconsin Fair Dealership Law 'good cause' refers to the errors and omissions of the dealer."). This focus on dealer deficiency was intentional: the fair dealership law does not allow grantors to take away dealerships unilaterally absent some dealer-related deficiency unless they can work out a fair termination agreement with their dealers.

■ I agree with Judge Shabaz that the *Ziegler II* analysis is not implicated when the changes the dealer seeks to impose is outright termination. I read the case as being applicable only to changes "sought to be imposed" that would maintain the dealership in a roughly comparable form. Such a reading of *Ziegler II* is consistent with the statute's focus on dealer deficiency provided in the good cause provision and with the statute's purpose of protecting dealers from grantors with superior bargaining power. Because defendant has failed to show that the changes it sought to impose on plaintiff would have maintained the dealership, *Ziegler II* is inapplicable.

In another attempt to avoid liability under the fair dealership act, defendant argues that *Kealey* and *Slowiak* are distinguishable from this case because the independent dealers in both cases derived their market identity solely from the grantor's name, while plaintiff is a diversified company with its own identity, independent of the Zenith name. This is a distinction without a difference. Plaintiff's ability to continue its existence without its Zenith dealership may be relevant to the issue of plaintiff's damages; it is not relevant to whether defendant violated the good cause provision of the fair dealership law.

Defendant makes the additional argument that *Kealey,* 761 F.2d 345, is distinguishable because that case involved a grantor that was terminating its independent dealerships to increase its profits, not to stem "hemorrhaging losses." Defendant is wrong. *Kealey* is not limited to actions by grantors that amount to a "profit-grab." *See Slowiak,* at *7 (immaterial whether termination was made to stem losses or increase profits because termination of dealership for economic concerns of grantor who remains in the marketplace is not good cause as a matter of law). *Kealey,* 761 F.2d at 350, held that if a grantor continues to market its products in a dealer's former territory, it can terminate its dealers without incurring liability only if it can prove performance deficiencies on the part of the dealer. The statutory focus on dealer deficiency applies regardless whether the grantor is acting to increase profits or to stem alleged losses. *See Kealey,* 539 F.Supp. at 1366 ("[T]he adverse impact upon a dealer of a unilateral termination of its dealership is not lessened because the grantor is acting in good faith for sound business reasons.").

Defendant's arguments cannot be reconciled with the policy decision the legislature made in enacting the Wisconsin Fair Dealership Law to "protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships" and to "promote fair business relations between dealers and grantors." Wis. Stat. §§ 135.025(2)(a)–(b). I decline defendant's invitation to substitute my own judgment for the legislature's and alter the playing field for Wisconsin dealerships. As I noted in *Kealey,* 539 F.Supp. at 1369, the "popularly-elected legislature is vested with the exclusive authority to determine the need for economic regulation and the appropriate response to such needs." It is consistent with *Kealey* and *Slowiak* to conclude that a dealer may not terminate a dealership solely to improve its own economic performance and continue to market its products in the dealer's former territory.

### ORDER

IT IS ORDERED that plaintiff Morley–Murphy's motion for partial summary judg-

ment is GRANTED on its claim that defendant Zenith Corporation violated the Wisconsin Fair Dealership Law and defendant Zenith Corporation's motion for partial summary judgment is DENIED.