**SATELLITE RECEIVERS, LTD.,
a Wisconsin corporation,
Plaintiff,**

v.

**HOUSEHOLD BANK (ILLINOIS) N.A., a
federally chartered bank, Defendant.**

**No. 96–C–161.**

United States District Court,
E.D. Wisconsin.

April 12, 1996.

---

Herbert C. Liebmann, III, Gregory A. Grobe, Craig A. Kubiak, Liebmann, Conway, Olejniczak & Jerry, S.C., Green Bay, WI, for plaintiff.

Daniel W. Hildebrand, Joseph A. Ranney, DeWitt Ross & Stevens, S.C., Madison, WI, for defendant.

## DECISION AND ORDER

STADTMUELLER, Chief Judge.

On February 7, 1996, Satellite Receivers, Ltd. (Satellite) filed this action in Brown County Circuit Court under the Wisconsin Fair Dealership Law (WFDL), Wis.Stat. §§ 135.01–07. On February 13, 1996, the defendant, Household Bank (Illinois) N.A. (Household), removed the case to federal court on the basis of diversity jurisdiction. On April 4, 1996, this court held a hearing on Satellite's motion for a preliminary injunction.[1] The motion is now ready for decision.

## I. BACKGROUND

Satellite is a Wisconsin corporation with its principal place of business in Green Bay, engaged in wholesale and retail sales and distribution of home television satellite receiving equipment and programming. Household is a federally chartered bank located in Wood Dale, Illinois, which provides financing for consumer purchases. Household is a division of Household International, a Forbes 500 company with 1995 calendar year-end managed interest earning assets of $36.7 billion and annual revenues of $4.6 billion.

Prior to 1992, Satellite did not offer any credit card financing for its dealers. On January 2, 1992, Satellite and Household entered into a written contractual agreement creating a private-label credit card financing program for Satellite to offer to its customers. Household marketed its private-label credit program as a "Value–Added Service" which would "offer convenience and value to each product sold." It also described the credit program as "one of the most powerful, productive assets that [merchants can] employ to gain market share and margins with relatively minimal financial outlay." Essentially, under the agreement Satellite could offer its own credit card, known as "CommCard" and financed by Household, to its customers through Satellite's dealers. This allowed Satellite's retail customers to make their purchases using the CommCard. Satellite's dealers provide the credit card application for the customer to fill out, review and verify the information provided, and then forward the application to Household for approval. If approved, the customer can use the CommCard to pay for the initial purchase and future purchases. Household collected interest on the CommCard purchases, and Satellite hoped to increase its sales by offering credit card financing to its customers.

Satellite invested about $2 million in Household's credit program. It set up a financing department, hired and trained employees, leased computers from Household, advertised and marketed the credit program, and paid start-up fees to Household. Satellite was obligated to pay Household for all "charge-backs," i.e., if a customer application was not filled out correctly, if the sale was fraudulent, if a customer disputed the sale, etc. Satellite also used its resources to train and supervise its dealers with regard to the credit program, and to communicate with its dealers on behalf of Household.

The program was profitable for both Satellite and Household. Satellite's net sales increased by approximately $3.5 million in

---

1. Satellite contends that the issue of market withdrawal is not ready for decision because Household has not cooperated in discovery on this issue. Accordingly, Satellite has filed a motion to compel discovery and to postpone consideration of Household's market withdrawal defense. Because I find the factual record as developed at the preliminary injunction hearing sufficient to address the issue of market withdrawal in the preliminary-injunction context and because the court's opinion should clarify for both parties relevant factual issues relating to the defense, the motion is moot.

1992, $8.5 million in 1993, and another $8.5 million in 1994. Satellite's net sales decreased in 1995, but the 1995 figure still was 52 percent above 1991's net sales. Fully 70 percent of Satellite's sales are made using the CommCard, of which more than 20,000 are in circulation.

In addition, although not found in any written agreement, beginning July 1, 1994 Household began to pay Satellite "merchant participation fees," or four percent of the finance charges Household billed the CommCard holders. Between July 1994 and February 1996, Household paid Satellite $236,723.57 in merchant participation fees. Presumably, then, Household received almost $6 million ($236,723.57/0.04 = $5,918,089.20) in finance charges from Satellite's customers during that same period.

Satellite's employees and dealers increased along with its sales. In 1991, before its agreement with Household, Satellite had 175 dealers and 25 employees. In 1992, with the creation of its financing department, the number of Satellite's employees rose to 42. By 1995, Satellite had 643 dealers and 79 employees.

In the fall of 1995, Household notified Satellite that it intended to terminate the private-label credit program. In a letter to Satellite's Chairman David Charles dated November 13, 1995, Household's Vice President of Sales, Doug Stuber, confirmed an October 13, 1995 phone call between Charles and Household's Assistant Vice President Frank Nardi regarding Household's plan to terminate Satellite's credit program as of March 7, 1996. The letter did not provide notice of any deficiency on Satellite's part. Indeed, it did not provide any specific reasons for the termination. In response to an inquiry by Charles, Stuber notified Charles in a letter dated December 14, 1995, that Household would not pay Satellite any merchant participation fees after termination of the credit program. Satellite suggests that Household terminated its credit program in order to avoid paying Satellite its four-percent merchant participation fees. Household disputes this, noting that there is no written contractual agreement to pay a merchant fee in the first instance.

## II. DISCUSSION

### A. Preliminary Injunction Standard

■ The Seventh Circuit has held that a party seeking preliminary injunctive relief must show that (1) no adequate remedy at law exists; (2) the moving party will suffer irreparable harm absent injunctive relief; (3) the irreparable harm suffered in the absence of injunctive relief outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) the moving party has a reasonable likelihood of success on the merits; and (5) the injunction will not harm the public interest. *Nalco Chem. Co. v. Hydro Technologies, Inc.,* 984 F.2d 801 (7th Cir. 1993); *United States v. Rural Elec. Convenience Coop. Co.,* 922 F.2d 429, 432 (7th Cir.1991); *Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1014 (7th Cir.1990); *Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988).

■ In order to prevail, the plaintiff must satisfy each element of this five-part test, *Somerset,* 900 F.2d at 1015 (citing *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386–87 (7th Cir.1984)), and the district court weighs each of these factors. *Somerset,* 900 F.2d at 1015. However, the Seventh Circuit has stated that of the five factors, the likelihood of success on the merits usually weighs most heavily in a court's determination. *O'Connor v. Board of Educ.,* 645 F.2d 578 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). With respect to this prong, Satellite only need show that its chances of succeeding on the merits are more than negligible. The greater that showing, the less the balance of harms need weigh in plaintiff's favor. *Roland,* 749 F.2d at 387.

Here, application of the WFDL somewhat simplifies (or complicates, depending upon one's view) the above factors. The case, at this stage, boils down to two key issues: (1) whether Satellite qualifies as a dealer under the WFDL and (2) whether Household's termination of Satellite, based on an alleged withdrawal from the satellite dish market, was with "good cause" under the WDFL.

The determination of these issues bears directly on Satellite's likelihood of success on the merits and whether Satellite will suffer irreparable harm absent injunctive relief.

### B. Whether Satellite Qualifies as a Dealer Under the WFDL

■ The WFDL defines a "dealership" as a contract or agreement, either express or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis.Stat. § 135.02(3). Household offers three arguments as to why Satellite should not qualify as a dealer under the WFDL: (1) Satellite does not sell or distribute goods or services; (2) Satellite did not have the right to use Household's name; and (3) there is no community of interest between Satellite and Household. I will address each argument in turn.

*1. "(S)ell or distribute goods or services...."* Household first contends that the financial services in question are not "goods or services": they are not goods because they are intangible, and they are not services because they are not "activities which add value to something else." Household provides no case law nor any further explanation to support its assertion that financial services are not services within the meaning of the WFDL.

This argument simply does not square with Household's methods and practices in marketing its private-label credit card program. Household billed its program as a way in which merchants could add "convenience and value" to their products. Household even titled its program as a "Value–Added Service." Because Household offers no other reason to find that its financial services are not services within the meaning of the WFDL, I find this argument an unlikely basis for determining that Satellite has a less-than-negligible chance of succeeding on the merits.

Household goes on to argue that Satellite does not sell or distribute Household's financial services. The cases on which Household relies, *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60 (1981), and *John Maye Co., Inc. v. Nordson Corp.*, 959 F.2d 1402 (7th Cir.1992), address only sales, not distribution. Those cases stand for the proposition that in order to sell goods or services, an alleged dealer must have the right to commit the grantor to a sale. But Satellite contends that it *distributes* Household's financial services to Satellite's customers via the CommCard.

In *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739 (7th Cir.1989), the court held that a plaintiff who "stored the [defendant's] books at his premises and delivered them to their final point of sale, setting up the books in the shelves from which the final consumer, the students, would choose their purchases," distributed the defendant's goods. *Moodie*, 889 F.2d at 744. Indeed, the court did not find it a hard question: "[T]he meaning of 'distribute' is clear and unambiguous.... [These facts are] sufficient." *Moodie*, 889 F.2d at 744.

*Moodie*'s facts are similar to those at hand. Household and Satellite entered into an agreement whereby Satellite could offer Household's financial services to Satellite's customers. Although Household had the final say on whether a particular customer's credit application was approved, Satellite informed its customers about the CommCard, provided the necessary applications, performed an initial verification of the application, and provided the final necessary element: the actual purchase which Household then financed. Essentially, Satellite delivered Household's financial services to the final point of sale, setting up the applications so that the final consumer, Satellite's customers, could choose to purchase Household's financial services. Based upon the factual record presented, I find that Satellite has the right to distribute Household's financial services within the meaning of the WFDL.

*2. "(U)se a trade name...."* I first note that given my determination that Satellite appears to have the right to distribute

Household's financial services, it is not necessary to find that Satellite had the right to use Household's name. One or the other is enough to qualify Satellite as a dealer under the WFDL. Nevertheless, I will address Household's argument with regard to Satellite's use of Household's name.

 Satellite argues that it has the right to use Household's name because it appears both on the CommCard and on materials which Satellite distributed to its dealers, including advertising materials. De minimus use of a trade name, however, is insufficient. *Moodie,* 889 F.2d at 743 (holding that plaintiff's use of defendant's trademark on plaintiff's business cards was de minimus and did not meet the dealership requirements of the WFDL); *Foerster,* 313 N.W.2d at 67 ("[I]t is eminently clear that there must be more than the mere use of a calling card identifying a manufacturer's representative as an agent for a company before such representatives are 'dealerships.'"). Instead, a dealer must make "a substantial investment in the trademark." *Moodie,* 889 F.2d at 743. The fact that Household's name appeared on the CommCard and on the materials distributed to Satellite's dealers does not show a "substantial investment." There is no specific evidence that Satellite paid for the advertising which included Household's name. *See John Maye Co.,* 959 F.2d at 1409 (considering whether alleged dealer paid for advertising using grantor's logo in determining whether use of the logo was de minimus). Additionally, the parties' agreement forbids Satellite from using Household's name without prior written consent. *See Kornacki v. Norton Performance Plastics,* 956 F.2d 129, 134 (7th Cir.1992) (considering fact that parties' contract explicitly prohibited unauthorized use of grantor's name in determining that alleged dealer's use of grantor's name was de minimus).

 These facts suggest that Satellite's use of Household's name is insufficient to qualify Satellite as a dealer on that basis alone.

*3. "(C)ommunity of interest...."* In order to create a dealership under the WFDL, the grantor and the alleged dealer must share a community of interest. "'Communi-

ty of interest' means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). A "continuing financial interest" in the business relationship, evidenced by, for example, the dealer's investment in grantor-specific inventory and facilities, or "interdependence" in the form of "shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship" indicates a community of interest. *Ziegler Co., Inc. v. Rexnord, Inc.,* 139 Wis.2d 593, 407 N.W.2d 873, 879–80 (1987). Thus,

> a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination.

*Frieburg Farm Equipment, Inc. v. Van Dale, Inc.,* 978 F.2d 395, 399 (7th Cir.1992). In determining whether the dealer's investments are specific to the grantor, the court considers whether the investments are tied to the grantor's products and thus would be worth less in another use. *Frieburg,* 978 F.2d at 399–400. The *Frieburg* court went on to opine, "We also suppose that some combination of revenues and investments could manifest a community of interest, even if neither could standing alone." *Frieburg,* 978 F.2d at 399. The Seventh Circuit recently reiterated the standard set forth in *Frieburg* in *Sales & Mktg Assocs., Inc. v. Huffy Corp.,* 57 F.3d 602, 605 (7th Cir.1995).

Household argues that there is no community of interest because Satellite's sales did not sharply increase as a result of the credit program and because Satellite did not receive a significant amount of money in merchant participation fees from Household. As Satellite points out, however, it invested approximately $2 million in Household's credit program by setting up a financing department, hiring and training employees, leasing computers from Household, and paying start-

up fees to Household. Satellite's net sales increased by approximately $3.5 million in 1992 (the first year of the credit program), $8.5 million in 1993, and another $8.5 million in 1994. Household represented the credit program as a way to increase Satellite's sales, and apparently the credit program did just that, since, as already noted, more than 70 percent of Satellite's retail sales involved use of the CommCard. The credit program certainly was profitable from Household's standpoint, as it collected almost $6 million in finance charges from Satellite's customers between July 1994 and February 1996.

Further, it appears that Satellite's investments are specific to Household. Satellite trained its employees in a computer program specific to Household's credit program, trained its employees and dealers more generally with regard to Household's credit program, paid for advertising regarding the CommCard, and paid start-up fees to Household. Although it certainly is conceivable that Satellite would be able to utilize its financing department at least to some extent with a different financial services company, this is not established by the facts as developed at this juncture.

These facts support a finding of a community of interest between Household and Satellite. Even if Satellite's investment will not be lost totally, its investment together with its increased profitability sufficiently demonstrate a community of interest. Under *Frieburg*, "some combination of revenues and investments could manifest a community of interest, even if neither could standing alone." *Frieburg*, 978 F.2d at 399.

Based on the facts as developed at this point, I conclude that Satellite distributes Household's financial services and shares a community of interest with Household. Thus, it appears likely that Satellite will qualify as a dealer under the WFDL.

### C. Whether Household's Alleged Withdrawal From the Satellite Dish Market Is Good Cause Under the WFDL

■ Section 135.03 of the WFDL prohibits termination of a dealership "without good cause." "Good cause" is "[f]ailure by a dealer to comply substantially with essential and reasonable requirements imposed by the grantor" or "[b]ad faith by the dealer in carrying out the terms of the dealership." Wis.Stat. § 135.02(4). Although there is no suggestion that Satellite failed to comply with Household's requirements or acted in bad faith, Household argues that its termination of Satellite was with good cause, based on Household's withdrawal from financing satellite dish sales. It alleges:

> Household experienced many problems with its programs in the Satellite Dish Market. A large number of consumers who purchased satellite equipment financed by Household made complaints to Household, to state attorneys general, and to consumer regulatory authorities that they were dissatisfied with the purchases. These consumers indicated that they were dissatisfied because of misrepresentations by the sales personnel; because the products they received had defects or experienced operational problems; because they did not understand that their purchases had been financed; and for other reasons. Many of these consumers rescinded their purchases or made claims which resulted in the rescission of the transaction.

> The complaint rates and rescission rates in the Satellite Dish Market were significantly higher than in most other markets in which Household offered credit card financing programs. Household attempted to identify and cure the causes of the high complaint and rescission rates and attempted to improve merchant and dealer practices, but it was not able to significantly reduce or eliminate these problems. Household found that it was very difficult to control the practices of merchant and dealer sales personnel in dealing with customers.

> . . . .

> Primarily as a result of these problems, in 1995 Household determined that it was incurring excessive expense with respect to its programs in the Satellite Dish Market; that its reputation and goodwill were being damaged by those programs; that it could not operate effectively or profitably in the Satellite Dish Market; and that it would be in Household's best interest to with-

draw from the Satellite Dish Market completely. Accordingly, Household decided to terminate as soon as possible all of its programs and involvement in the Satellite Dish Market.

Defendant's Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, at 5–7. Despite these alleged problems with the satellite dish market, Household admits that "[Satellite] and its dealers created relatively few problems."

In *St. Joseph Equip. v. Massey–Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis.1982), then-district Judge Evans, sitting by designation, held that the WFDL's prohibition on termination of dealerships without good cause is not violated where "the grantor undertakes a non-discriminatory withdrawal from a product market on a large geographic scale." *St. Joseph*, 546 F.Supp. at 1247. Despite the WFDL's limited definition of good cause, Judge Evans relied on the WFDL's underlying purposes and reasoned,

> It would hardly be consistent with notions of "fair business relations" or "the continuation of dealerships on a fair basis" to force a grantor to endure substantial financial loss to enable a dealer to continue selling certain products.... Nor is it, in my view, "unfair treatment" of a dealer for a grantor to make a product or total market withdrawal affecting all dealers in a certain geographic area non-discriminatorily. As the defendant points out, a dealer's continued operation depends in large part upon the well-being of the grantor and, ultimately, the profitability of the grantor's business. Where the problem is related to a particular dealer's unsatisfactory performance, the specific prohibitions of the WFDL guard against high-handedness on the part of the economically more powerful grantor while still allowing the grantor some flexibility to rectify matters. But where the problem or the motivation for the grantor to act is larger than a question simply of the performance of a particular dealer, the WFDL's underlying purposes must govern. Consistent with those purposes, it is my conclusion that where, as here, a grantor makes a non-discriminatory product withdrawal over a large geo-

graphic area, that, without more, is not a violation of § 135.03, Wis.Stats.

*St. Joseph*, 546 F.Supp. at 1248 (quoting Wis. Stat. § 135.025). Additionally, Judge Evans held that only the ninety-day notice requirement of section 135.04 applied to a market withdrawal. *St. Joseph*, 546 F.Supp. at 1249.

In *Lee Beverage Co., Inc. v. I.S.C. Wines*, 623 F.Supp. 867 (E.D.Wis.1985), Judge Warren endorsed Judge Evans's decision:

> This Court fully agrees with the analysis and result in the *St. Joseph* case. The Wisconsin Fair Dealership Law was intended to protect dealers from unjustified, imperious acts on behalf of economically superior grantors. The law was not intended to compel the perpetuation of a business relationship when, for sound financial reasons, a grantor determines that the sales of its product over a wide geographic area are no longer a profitable venture.
>
> The plaintiff's argument that *St. Joseph* should be distinguished from the present case because the defendant here did not terminate or alter the dealership agreement due to economic necessity must be rejected. "Good cause" for a dealership termination need not be found only when the continuation of a dealership arrangement would mean financial ruin for the grantor. The reasoning expressed in *St. Joseph* applies equally well to a situation where the profitability of wide-scale sales of a product line has sunk to such a point that a sale or discontinuation of the product line is justified for the good of the corporation. A law which required otherwise would no doubt be subject to legitimate attack on the basis of constitutional principals.

*Lee Beverage*, 623 F.Supp. at 869 (footnote omitted).

In *Kealey Pharmacy & Home Care Service, Inc. v. Walgreen Co.*, 539 F.Supp. 1357 (W.D.Wis.1982), *affd*, 761 F.2d 345 (7th Cir. 1985), Judge Crabb adhered to the specific definition of good cause provided in Wis.Stat. § 135.02(4) and held that even large-scale nondiscriminatory terminations may violate section 135.03:

[L]ogic alone would compel the conclusion that the legislature did not intend to provide an exception from the Fair Dealership Law for large scale terminations of dealerships, any more than it intended to permit exceptions for the termination of a single dealership for a bona fide business reason. As several commentators have pointed out, the adverse impact upon a dealer of a unilateral termination of its dealership is not lessened because the grantor is acting in good faith for sound business reasons. Neither is the adverse impact lessened because all other similarly-situated dealers are being terminated as well.

*Kealey Pharmacy,* 539 F.Supp. at 1366 (footnote omitted). Judge Crabb concluded that

a Wisconsin court considering this issue would hold that the Wisconsin Fair Dealership Law is not limited in its application to only those terminations or other adverse actions that discriminate against one dealer in relation to other dealers; rather, a Wisconsin court would conclude that the law was intended to, and does, cover nondiscriminatory, across-the-board terminations of dealerships even if those terminations are undertaken because the grantor decides to withdraw from an entire geographic area, or to cease production of the products sold by its dealers, or to change its marketing structure, or for any other business reason.

*Kealey Pharmacy,* 539 F.Supp. at 1368. Although the Seventh Circuit affirmed on this issue, it noted that *St. Joseph* was not necessarily contrary because Judge Evans specifically stated that he agreed with Judge Crabb's decision in *Kealey Pharmacy* based on its facts. *Kealey Pharmacy,* 761 F.2d at 350 (citing *St. Joseph,* 546 F.Supp. at 1248). The Seventh Circuit went on to say, "Since Walgreen intends to maintain and increase its own stores in the same marketing area in competition with plaintiffs who helped to build up the Walgreen reputation and image there, it was not unfair for the Wisconsin legislature to prohibit a manufacturer and supplier such as the defendant from terminating all its dealers because they produced an inadequate rate of return." *Kealey Pharmacy,* 761 F.2d at 350.

Recently, in *Morley–Murphy Co. v. Zenith Elecs. Corp.,* 910 F.Supp. 450 (W.D.Wis. 1996), Judge Crabb revisited the issue of good faith under the WFDL and offered a possible basis for reconciling *St. Joseph, Lee Beverage,* and *Kealey Pharmacy.* In *Morley–Murphy,* Zenith terminated its distributors and planned to distribute directly to the retail community. Zenith argued that terminating its independent distributors, such as Morley–Murphy, was necessary to cut its operating losses. The court held that the termination of Morley–Murphy violated the WFDL because it was without good cause as defined section 135.02(4). The court explained,

Accepting defendant's argument that it had good cause to terminate plaintiff would eviscerate the Wisconsin Fair Dealership Law. It would allow any supplier that alleged economic loss the ability to terminate its Wisconsin dealers unilaterally and take over the market the dealers had developed, provided only that the supplier could show it had "considered" the problem and had come to believe a broad structural change would serve to stem its losses. The law would no longer provide the protection from opportunistic behavior on the part of grantors that is memorialized in the good cause provision's focus on dealers' performance deficiencies. This focus on dealer deficiency was intentional: the fair dealership law does not allow grantors to take away dealerships unilaterally absent some dealer-related deficiency unless they can work out a fair termination agreement with their dealers.

*Morley–Murphy,* 910 F.Supp. at 457–58 (citation omitted). The court also rejected Zenith's argument that *Kealey Pharmacy* was distinguishable by the fact that Zenith was not seeking to increase its profits, but to stem its losses: "*Kealey* is not limited to actions by grantors that amount to a 'profit-grab.' *Kealey* held that if a grantor continues to market its products in a dealer's former territory, it can terminate its dealers without incurring liability only if it can prove performance deficiencies on the part of the dealer." *Morley–Murphy,* 910 F.Supp. at 458 (citations omitted).

Thus, one way to read *St. Joseph* and *Lee Beverage*, on the one hand, and *Kealey Pharmacy* and *Morley–Murphy*, on the other, together is to distinguish between grantors who remain in the marketplace and those who withdraw from the market entirely. The purely economic concerns (that is, unrelated to the performance of a particular dealer) of a grantor who remains in the marketplace cannot provide good cause for termination as a matter of law. *Morley–Murphy*, 910 F.Supp. at 458; *Slowiak v. Hudson Foods, Inc.*, 1992 WL 176983, *8 (W.D.Wis. 1992), *aff'd on other grounds, Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293 (7th Cir. 1993). If a grantor withdraws entirely from the market, however, its economic concerns may constitute good cause under the WFDL. *Slowiak*, 1992 WL 176983 at *8 ("[*St. Joseph* and *Lee Beverage]* are premised on the notion that a grantor threatened with economic ruin ought to be permitted to withdraw entirely from the marketplace."); *Lee Beverage*, 623 F.Supp. at 869; *St. Joseph*, 546 F.Supp. at 1248 (agreeing with the result in *Kealey Pharmacy* based on the facts involved).

Two options, then, are open to Household: it may show compliance with the WFDL's good-cause provision by establishing either (1) that although it remains in the satellite dish market, Satellite acted in bad faith or failed to comply with Household's essential and reasonable requirements, or (2) that it has withdrawn from the satellite dish market entirely based on such low profitability as to justify the withdrawal. Satellite, however, suggests that Household has not withdrawn completely from the satellite dish market, in that it continues to finance satellite dish purchases through merchants which do not deal primarily in satellite dishes, or, in the alternative, that Household has failed to substantiate the economic basis for the alleged complete market withdrawal.

Household has the burden of proving good cause under the WFDL. Wis.Stat. § 135.03. It has not provided sufficient evidence to show that it indeed has withdrawn entirely from the satellite dish market or that its profitability in the satellite dish market "sunk to such a point" that withdrawal from

the market is justified. *Lee Beverage*, 623 F.Supp. at 869. Further, there is nothing in the record before the court to suggest that Satellite acted in bad faith or failed to substantially comply with Household's essential and reasonable requirements. In sum, based on the record as developed, Household has failed to establish good cause for its termination of Satellite under either line of cases. It appears likely, therefore, that Satellite will succeed on its claim under the WFDL.

### D. Application of the Preliminary Injunction Factors

■ *1. No adequate remedy at law exists* and *2. The moving party will suffer irreparable harm absent injunctive relief.* Satellite has provided sufficient proof that Household violated the WFDL to entitle Satellite to the statutory presumption of irreparable harm under section 135.065 ("[A]ny violation of this chapter by the grantor is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued."). Further, Satellite alleges that over 20,000 of its customers have the CommCard, which was supposed to be usable for future purchases at Satellite's dealers. Not only will Satellite presumably have to replace Household's financial services in order to keep up their increased sales volume (and perhaps retrain its dealers and employees accordingly), but it will have to address its 20,000 customers left with a completely worthless credit card with Satellite's name on it. Loss of goodwill, of course, may constitute irreparable harm. *See, e.g., Gateway E. Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir.1994) ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages.").

■ *3. The irreparable harm suffered in the absence of injunctive relief outweighs the irreparable harm the defendant will suffer if the injunction is granted.* The only argument offered by Household that it will suffer irreparable harm is that it will not be able to completely withdraw from what it considers to be an unprofitable market. However, Household admits that "[Satellite] and its dealers created relatively few problems" and that Satellite has been (and presumably re-

mains) a profitable account for Household. Thus, it appears that Household will suffer little if any irreparable harm if the injunction is granted.

*4. The moving party has a reasonable likelihood of success on the merits.* Based on my analysis regarding whether Satellite qualifies as a dealer under the WFDL and whether Household's termination of Satellite was with "good cause" under the WDFL, it appears that Satellite has a reasonable likelihood of success on the merits. Indeed, Satellite has shown that its chances of succeeding on the merits are relatively strong.

*5. The injunction will not harm the public interest.* Finally, there is no indication that the injunction will harm the public interest.

### III. CONCLUSION

Based on the reasons stated above, I will grant Satellite's motion for a preliminary injunction enjoining the unlawful termination, cancellation, non-renewal, or substantial change of the competitive circumstances of the parties' agreement.

Accordingly,

**IT IS ORDERED** that the motion for a preliminary injunction, filed by the plaintiff, be and the same is hereby **GRANTED;** and

**IT IS FURTHER ORDERED** that the motion to compel discovery and to postpone consideration of the market withdrawal defense, filed by the plaintiff, be and the same is hereby **DENIED.**