**MORLEY–MURPHY COMPANY,**
Plaintiff,

v.

**ZENITH ELECTRONICS CORPORATION,**
Defendant.

No. 95–C–255–C.

United States District Court,
W.D. Wisconsin.

Sept. 30, 1996.

W. Stuart Parsons, Quarles & Brady, Milwaukee, WI, for Morley–Murphy Company.

Michael A. Bowen, Foley & Lardner, Milwaukee, WI, for Zenith Electronics Corporation.

## OPINION AND ORDER

CRABB, District Judge.

This civil action for money damages arises out of defendant Zenith Corporation's termination of its dealership relationship with plaintiff Morley–Murphy Company. The case is before the court on defendant's post-judgment motions for amendment of the judgment and for entry of judgment as a matter of law. Trial was limited to the question of damages after plaintiff's motion for partial summary judgment was granted on the ground that plaintiff had shown as a matter of law that defendant had terminated the parties' relationship without good cause, in violation of the Wisconsin Fair Dealership Law, Wis.Stat. §§ 135.01.–07. The jury awarded plaintiff damages of $2,374,629: $687,647 as compensation for out-of-pocket expenses resulting from the unlawful termination; $605,590 as compensation for lost future profits on sales of defendant's products from plaintiff's Milwaukee and Green Bay locations; and $1,081,392 as lost future profits on sales of defendant's products from plaintiff's Iowa and Minnesota locations.

In its post-judgment motions, defendant contends first that the damage amounts awarded by the jury are not supported by the evidence, that the amount awarded for out-of-pocket expenses should be reduced from $687,647 to $256,072 and that the amount awarded for future lost profits should be reduced to $0. In addition, defendant contends that awarding damages for future lost profits on sales from plaintiff's Iowa and Minnesota locations would extend the Wisconsin Fair Dealership Law beyond the borders of the state in violation of the dormant commerce clause of the United States Constitution. Accordingly, defendant argues, the amounts awarded for loss of future profits on sales at those out-of-state locations should be reduced to $0.

I conclude that defendant's post-judgment motions must be denied. The jury had sufficient evidence before it to sustain the damages it awarded and granting plaintiff monetary damages for the loss of future sales from its Iowa and Minnesota locations does not violate the dormant commerce clause.

### A. *Sufficiency of Evidence as to Damage Amounts Awarded*

1. *Out-of-pocket expenses*

The jury awarded plaintiff $687,647 as compensation for out-of-pocket expenses resulting from the unlawful termination. Defendant takes issue with the portion of that award that is attributable to the contribution to profit approach advanced by plaintiff's expert, Ralph Ells. Ells testified that out-of-pocket expenses should include those expenses plaintiff incurred that would have been covered with money generated from sales of Zenith products had the unlawful termination not taken place. Included in these expenses were executive compensation, corporate office overhead, professional fees and accounting, computer operations and office space. Ells identified the percentage of

these expenses covered by Zenith revenue and phased out the costs over a five-year period. Defendant argues that this approach puts plaintiff in a better position than it would have been in without the unlawful termination (because plaintiff would have incurred these expenses even if the relationship continued) and that Ells did not make an appropriate allocation of the costs attributable to defendant's portion of plaintiff's overall business, making his conclusion too speculative to support the jury's verdict in this respect.

■ Under Wisconsin's dealership law, plaintiff is entitled to recover the damages it sustained as a consequence of defendant's violation of the act. Wis.Stat. § 135.06. The jury could have found reasonably from Ells's testimony that as a consequence of defendant's termination, plaintiff had lost the Zenith sales revenue that had covered a portion of its fixed costs, that it could not reduce or eliminate these costs immediately and that it had to pay the expenses out of other revenue sources, thereby incurring an expense recoverable under the act over and above any lost future profits. Ells's allocation of a portion of the fixed costs to defendant was not so inexact as to reduce his actual numbers to sheer speculation. Ells testified that he arrived at an actual number by allocating a percentage of the fixed costs that had been covered by Zenith revenue. The jury could have relied reasonably on this testimony in making its award. I am persuaded that defendant has failed to show that it is entitled to judgment as a matter of law on plaintiff's claim for out-of-pocket expenses.

2. *Likelihood of future profits*

■ Defendant maintains that the jury's award of lost future profits is fatally flawed because the jury must have assumed, as Ells did in calculating lost future profits, that defendant would continue giving pricing subsidies to plaintiff on Zenith products. Defendant argues that the jury could have found that plaintiff would have made profits on Zenith sales in future years only if it believed defendant would have continued giving subsidies to plaintiff. Defendant maintains that such a finding would be nonsensical in light

of defendant's decision to go to a one-step distribution system that eliminated distributors like plaintiff. Although defendant cites extensive evidence to support its position, the question is not whether everyone who heard the evidence would have reached the same conclusion the jury did; the question is whether the jury's conclusion was unreasonable. Defendant has failed to show that it was. The jury's award shows that the jury did not assume that the subsidies would continue at historical levels for the full ten-year period. It awarded plaintiff only $1,686,982, although plaintiff had asked for over $10 million in lost future profits. Plaintiff adduced credible evidence that the price subsidy was simply a method of determining the price for which defendant was willing to sell its product and that defendant has continued to offer several special pricing programs in its new "one-step" distribution system. It was not unreasonable for the jury to find from this evidence that if defendant had continued its relationship with plaintiff, the relationship would have included some type of price subsidy or special pricing program.

### B. *Commerce Clause Implications*

■ The most interesting question defendant raises is whether the jury's award of lost future profits based on plaintiff's projected sales of Zenith products from its Iowa and Minnesota locations extends the application of the Wisconsin Fair Dealership Law into other states, in violation of the dormant commerce clause. U.S. Const. art. I, § 8. The dormant commerce clause is the corollary of the commerce clause's delegation to Congress of the power to regulate commerce among the several states. "[T]his affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the states to enact legislation affecting interstate commerce." *Healy v. Beer Institute*, 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 2494 n. 1, 105 L.Ed.2d 275 (1989). The dormant commerce clause's implied limit on the authority of states to affect interstate commerce reflects "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce

and with the autonomy of the individual States within their respective spheres." *Id.* at 335–36, 109 S.Ct. at 2499.

Under the dormant commerce clause, courts have struck down state economic regulation of two types: 1) those that discriminate against interstate commerce and 2) those that seek to regulate interstate commerce directly. *See generally National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1131 (7th Cir.1995) (discussing discriminatory commerce clause cases and dividing them into three categories: the first two comprising legislation discriminating against interstate commerce either directly or indirectly ("disparate treatment" and "disparate impact") and the third encompassing "laws that affect commerce without any reallocation among jurisdictions—that do not give local firms any competitive advantage over those located elsewhere" and are analyzed under the balancing approach espoused in *Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)); *cert. denied,* —— U.S. ——, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). Defendant concedes that the Wisconsin dealership law does not discriminate against out-of-state manufacturers, but contends that it falls in the second category of unconstitutional legislation because it directly regulates commerce occurring outside the state. *See Healy,* 491 U.S. at 336, 109 S.Ct. at 2499 (in assessing whether state regulation seeks to regulate interstate commerce directly, court should consider whether state statute has practical effect of regulating commerce occurring wholly outside the state). Defendant contends that allowing plaintiff to recover lost future profits for sales made in other states gives the dealership law illegal extraterritorial application.

 As defendant notes, the commerce clause prohibits the application of state law to commerce that takes place wholly outside the state's borders, " 'whether or not the commerce has effects within the State.' " *Healy,* 491 U.S. at 336, 109 S.Ct. at 2499 (quoting *Edgar v. MITE Corp.,* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (plurality opinion)); *see also Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) ("Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce."). In determining whether a state law regulates commerce "wholly outside" the enacting state, the focus must be on the practical effect of the regulation at issue rather than on the enacting legislature's intent. The court must consider both whether the statute controls conduct beyond the enacting state's borders and whether its application in other states creates a risk of competing and inconsistent legislation if other states adopted similar legislation. *Healy,* 491 U.S. at 336–37, 109 S.Ct. at 2499–500; *National Solid Wastes Management Ass'n v. Meyer,* 63 F.3d 652, 659 (7th Cir.1995) ("*Healy, Brown–Forman Distillers Corp.,* and *MITE Corp.* thus establish that the Commerce Clause constrains a state from projecting its economic legislation onto commerce wholly occurring in its sister states."); *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). Applying these principles in *Healy,* the Court overturned a Connecticut price-affirmation statute that required out-of-state shippers of beer to affirm that their prices in Connecticut were no higher than the prices they were charging in bordering states. *Healy,* 491 U.S. at 337, 109 S.Ct. at 2499–500. The practical effect of the legislation was to control commercial activity occurring wholly outside the state boundaries; furthermore, the legislation had the potential effect of creating "the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Id.*

Defendant characterizes this case as similar to *Healy* because it involves the direct regulation of commercial activity occurring wholly outside the state. In fact, the case differs from *Healy, Brown–Forman, MITE Corp.* and other similar cases in an important and defining respect. The regulation of out-of-state activity occurs not because the state has made a decision to enact legislation that operates beyond the state's borders, but because the parties have entered into an agreement under which they operate in other states through a dealer located within Wis-

consin. If Wisconsin law governs plaintiff's operation of its Minnesota and Iowa distributorships, it does so either because the parties agreed explicitly that it would or because that is the effect of the parties' agreement.

The parties have cited only one case addressing a situation in which the projection of state law is the result of a private agreement: *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995), a case that engaged the attention of both the federal and the state judiciary. The case began in federal court, where the franchisor contended, among other things, that application of New Jersey's franchise law to its agreement would violate the dormant commerce clause. The district court declined to address the question and abstained under *Railroad Commission v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), in order to give the New Jersey state courts an opportunity to decide whether the New Jersey franchise law applied to the particular business relationships. Using a choice of law analysis to determine the application of New Jersey law to the parties' agreement, the state supreme court concluded that the state had sufficient interests in the franchise agreement to make New Jersey law applicable. Moreover, the agreement met the statutory requirements of the New Jersey franchise act. *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124 (1992).

The case returned to the federal court to determine whether application of the New Jersey law would offend the commerce clause. The district court held that it would because the practical effect would be that New Jersey's law was directly regulating out-of-state business activity. The court of appeals reached the opposite conclusion. In its view, the extraterritorial application of the franchise law resulted from the parties' agreement to give the New Jersey franchisee a multi-state territory, rather than from any attempt by New Jersey to extend or project its protective regulation beyond its borders. *Instructional Systems*, 35 F.3d at 826. The court of appeals used this "private projection" aspect to distinguish the case from

*Healy*, 491 U.S. 324, 109 S.Ct. 2491, in which the statute's extraterritorial effects were dictated by the state, "operating independently of any parties' contract." *Id.* The court dismissed the idea that application of New Jersey law constituted a commerce clause problem, noting that many laws have extraterritorial effects, not all of which are prohibited for that reason. *Id.* at 825. Whenever contracting parties agree to the application of one state's law to their contract or a court determines what state law will apply to a dealership agreement, the effect is that one state's law is applied extraterritorially but such extraterritorial application does not amount to a violation of the commerce clause. *Id.* "In traditional contract litigation, courts must apply some state's law to interpret the contract. While a contract which covers multiple states may raise a difficult conflict-of-laws question, once that question is resolved, there is nothing untoward about applying one state's law to the entire contract, even if it requires applying that state's laws to activities outside the state." *Id.*

In *Instructional Systems*, the court of appeals was satisfied that *Healy's* concern for conflicting state regulations was not an issue. There was no reason to think that any other state would impose obligations on the parties "which would require them to violate New Jersey law or vice versa." *Instructional Systems*, 35 F.3d at 826. The court emphasized the limits of its conclusion that the commerce clause did not forbid the application of New Jersey franchise law to multi-state distribution agreements. New Jersey could not apply its franchise law to any franchise agreement in the country, so long as suit is brought in New Jersey. "Nothing in the text of the [franchise act] reaches that far. Indeed, the New Jersey Supreme Court noted that '[b]y definition, the Act, and particularly its community-of-interest requirement, is intended to protect business parties who made a franchise-specific capital investment of either goods or services in New Jersey.'" *Id.* at 825 (quoting *Instructional Systems* 614 A.2d at 148.) By its own terms, New Jersey's franchise act required a showing that the franchise has a close connection with New Jersey. Thus, the act applies only to situations "'in which there are "contacts"

with the forum [and] "interests" arising out of those contacts.' " *Id.* (quoting *Instructional Systems, Inc.,* 614 A.2d at 148).

■ The court of appeals' analysis in *Instructional Systems* analysis is logical and persuasive. The application of the law of one state or another to a private agreement does not implicate the dormant commerce clause, which is directed at keeping the channels of interstate commerce open and unobstructed by conflicting regulations enacted by state and local governmental entities. Once the court has found that the projection of a state's law into interstate commerce derives from a private source and not from an attempt by the state to extend its regulations beyond its borders, the court's commerce clause analysis is at an end. The only exception might be a situation in which a party could show that it would be subject to conflicting regulations if an agreement is found to be applicable to out-of-state transactions.

■ With the commerce clause essentially out of the picture, defendant's challenge comes down to a determination of the proper law to apply to its agreement. This involves nothing more than the usual task of deciding whether the agreement at issue is one to which Wisconsin's law applies under a conflict of laws analysis and whether the parties' relationship is protected by Wisconsin's dealership law. In this case, however, those questions are no longer open. Defendant has forgone its opportunity to show why Wisconsin law would not apply. Defendant could have filed a motion prior to trial, asking for a determination of the applicability of Wisconsin law to the agreement or agreements governing plaintiff's operation of the Minnesota and Iowa distributorships. Alternatively, it could have adduced evidence on this issue at trial. Having done neither, it is foreclosed from attacking the applicability of Wisconsin law to the parties' relationship. The present record contains no facts on such things as whether the parties signed separate agreements for the operation of the Iowa and Minnesota operations; the nature and scope of the agreement or agreements covering these operations; the extent to which accounting, inventory, supervision and planning for the Minnesota and Iowa sales took place in Wisconsin, *cf. Diesel Service Co. v. AMBAC International Corp.,* 961 F.2d 635, 641 (7th Cir.1992) (actual physical location of sales not as important as location of overall management, direction and control); the location of decision-making regarding the Zenith line; or the parties' expectations about the applicability of the Wisconsin dealership law.

Moreover, defendant has not shown that extraterritorial application of the Wisconsin act would create an impermissible risk of inconsistent obligations for parties operating in interstate commerce. Unlike the real possibility for regulatory conflict identified in *Healy,* 491 U.S. at 337, 109 S.Ct. at 2500 (price-affirmation statute would conflict with "many other ... affirmation laws that *have been* or might be enacted throughout the country") (emphasis supplied), defendant has failed to show that the potential for regulatory conflict in this instance is anything more than a remote possibility. Whatever potential there might be is reduced because the act is applied in other states only if a grantor chooses to use a dealership operating in Wisconsin to make out-of-state sales. Grantors who make such a choice must be prepared to sort out the effect of each state's laws.

Plaintiff's right to seek damages for the loss of its future profits from its Minnesota and Iowa operations derived from its agreement with defendant. In the absence of any showing by defendant that this agreement is not governed by Wisconsin law or that it is not subject to Wisconsin's fair dealership law, there is no reason not to apply the provisions of the dealership law to the out-of-state operations in the same way as to the in-state operations.

## ORDER

IT IS ORDERED that defendant Zenith Corporation's motions for judgment as a matter of law and for amendment of the judgment on the issue of damages for defendant's violation of the Wisconsin Fair Dealership Law are DENIED.