**MORLEY–MURPHY CO.,**
Plaintiff–Appellee,

v.

**ZENITH ELECTRONICS CORP.,**
Defendant–Appellant.

No. 96–3527.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1997.

Decided April 10, 1998.

W. Stuart Parsons (argued), Katherine H. Grebe, Michael John Fischer, Quarles & Brady, Milwaukee, WI, for Plaintiff-Appellee.

Hille R. Sheppard, Constantine L. Trela, Jr. (argued), Sidley & Austin, Chicago, IL, John S. Skilton, G. M. Laskis, Foley & Lardner, Madison, WI, Michael A. Bowen, Foley & Lardner, Milwaukee, WI, for Defendant-Appellant.

Brian E. Butler, Joseph P. Wright, Stafford, Rosebaum, Rieser & Hansen, Madison, WI, for Amicus Curiae.

Before POSNER, Chief Judge, and MANION and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Like many states, Wisconsin has a law that regulates the relationship between manufacturers and their dealers. See Wis. Stat. Ann. § 135.01 et seq. (West 1997) (Wisconsin Fair Dealership Law hereafter "WFDL"). Dealers invest in a great deal of firm-specific, or brand-specific, capital, in the goods that they carry, and many states have concluded that this leaves the dealers vulnerable to opportunistic manufacturer behavior; this belief in turn has led those states to intervene legislatively. The present case calls on us to decide whether Zenith Electronics Corp., a manufacturer of consumer electronic products, violated the WFDL when it decided not to renew its 58–year–old distributorship agree-ment with Morley–Murphy Co. as part of a nationwide strategy to shift from independent distributors to direct marketing. The district court granted Morley–Murphy's motion for partial summary judgment on liability, finding that Zenith had violated the WFDL. See *Morley–Murphy Co. v. Zenith Elec. Corp.*, 910 F.Supp. 450 (W.D.Wis.1996). After the trial on damages, a jury awarded Morley–Murphy $2,374,629, which the district court confirmed in all regards. See *Morley–Murphy Co. v. Zenith Elec. Corp.*, 942 F.Supp. 419 (W.D.Wis.1996). On appeal, Zenith claims both that its decision to terminate Morley–Murphy was permissible under the WFDL and that, even if the district court's summary judgment on liability was correct, the jury's award of damages was flawed in a number of respects.

I

In presenting the facts relevant to the liability issue, we take them in the light most favorable to Zenith, the party that opposed the motion for partial summary judgment. *JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 272 (7th Cir.1996). Zenith is a Delaware corporation with its principal place of business in Glenview, Illinois, and Morley–Murphy is a Wisconsin corporation with its principal offices in Green Bay, Wisconsin. Until July 1, 1995, Morley–Murphy served as a distributor of Zenith's consumer electronic products under a series of annual distributorship agreements. For a long time, Morley–Murphy's territory covered most of Wisconsin and the Upper Peninsula area of Michigan, but in 1993, the territory expanded to include Iowa, western Wisconsin, Minnesota, North Dakota, and South Dakota. Paragraph 18 of the distributorship agreement specified that it was to "be governed by the laws of the State of Illinois."

During its 58–year association with Zenith, Morley–Murphy was apparently a very successful dealer, and in 1994 Zenith products accounted for a hefty 54% of Morley–Murphy's total business. Around that time, however, business was not rosy for Zenith. In fact, as is well documented in the Japanese Electronics Products litigation, the domestic consumer electronics industry in the United

States had been in a state of decline for more than 30 years. See generally *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 576–77, 106 S.Ct. 1348, 1350–51, 89 L.Ed.2d 538 (1986). Zenith had reported a net operating loss in nine of the last ten years prior to the events here, and in the last five years alone it had lost over $320 million. In the first half of 1995, right before it ended its relationship with Morley–Murphy, Zenith reported net operating losses of $60.8 million.

This dismal trend inspired efforts at corporate reorganization. One aspect of Zenith's business that came under the microscope was its distribution system. Until the 1980s, Zenith had relied principally on a network of independent distributors like Morley–Murphy, who sold Zenith televisions and other products to small specialized retailers and a few large department stores. Since the mid–1980s, however, large discount consumer electronics retailers like Circuit City, Sears, and Best Buy began to account for more and more sales. Many of these companies operated their own distribution centers and insisted on dealing directly with manufacturers. By 1994, direct sales to large national retailers represented almost half of Zenith's sales volume, and its 15 remaining independent distributors sold only about 20% of its products. Zenith had to subsidize these latter sales through extra discounts that cost it millions of dollars a year.

During the summer of 1993, Zenith organized a task force to study its sales and distribution system. That group reported back in February 1994 that Zenith could probably reap substantial savings if it converted to "one-step distribution," in which its products would be shipped directly from its factories to the retailers' warehouses. In November 1994, Zenith adopted this recommendation, with the goal of full implementation by July 1, 1995. This led Zenith to write to Morley–Murphy on March 30, 1995, informing Morley–Murphy that it would be formally terminated as a distributor effective June 30, 1995. Importantly for Morley–Murphy's WFDL claim, Zenith's notice did not suggest any way in which Morley–Murphy could "cure" (within 60 days or any other time) the problem that lay behind the decision to terminate, and it did not identify any deficiency in Morley–Murphy's performance as a dealer. Shortly before the March 30 letter was sent, the parties met to discuss Zenith's impending move to see if litigation might be avoided. Zenith offered to allow Morley–Murphy to keep the "premium business," which referred to television sets sold to companies that used them as premiums or gifts for employees and customers. Because "premiums" represented such a small percentage of its normal Zenith business, Morley-Murphy rejected that offer out of hand.

As the district court noted in its partial summary judgment opinion, Zenith "terminated [Morley–Murphy] as part of a system-wide, nondiscriminatory change from two-step to one-step distribution intended to stem overall losses and improve financial performance by improving efficiency and the ability to respond to the demands of large retail buyers and by eliminating subsidies to distributors such as plaintiff." 910 F.Supp. at 453. Zenith never bothered to determine whether Morley–Murphy, standing alone, was a profitable dealer, or if independent distribution in the upper Midwest might have been preferable to one-step distribution. Nor does the record show how successful Zenith's change in business strategy has been, or how its current financial health relates to this particular move. Upon termination of Morley–Murphy's dealership, Zenith took over sales to retail accounts in Morley–Murphy's former territory and has aggressively promoted its products there.

## II

■ The initial question we must consider is a pure issue of law, which we of course review *de novo*: does the WFDL permit a grantor to terminate a dealership agreement for the kind of reason Zenith offered? The statute expressly addresses the issue of "cancellation and alteration" of dealerships in § 135.03:

No grantor, directly or through any officer, agent or employe[e], may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause.

The burden of proving good cause is on the grantor.

"Good cause," in turn, is a defined term under the statute:

"Good cause" means:

(a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b) Bad faith by the dealer in carrying out the terms of the dealership.

Wis. Stat. Ann. § 135.02(4) (West 1997).

Although this court has previously construed these parts of the WFDL, see, *e.g.*, *Kealey Pharmacy & Home Care Svcs., Inc. v. Walgreen Co.*, 761 F.2d 345, 350 (7th Cir. 1985); *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240–41 (7th Cir.1986), we are obviously not the last word on the subject. See *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 137–39 (7th Cir.1990) (citing *Kealey* and *Remus* when applying similarly structured Indiana law to distributor termination). We must instead ascertain how Wisconsin interprets its own law. The Wisconsin Supreme Court's most recent pronouncement on the subject came in *Ziegler Co. v. Rexnord, Inc.*, 147 Wis.2d 308, 433 N.W.2d 8 (1988), which appeared after both *Kealey* and *Remus*. Rexnord manufactured construction, mining, and material-handling equipment. In 1980 it entered a one-year dealership contract with Ziegler, which blossomed a year later into a three-year agreement. In 1983, Rexnord informed Ziegler that it had decided to allow the agreement to expire. The parties held a series of meetings, at which Rexnord representatives offered Ziegler the opportunity to continue carrying its products by entering a "tight agency" sales representation agreement. Under that proposal, Ziegler's duties and compensation arrangements would have been materially different. As a dealer, Ziegler purchased Rexnord equipment and parts at a substantial discount off list price and sold them for whatever the market would bear. As a "tight agent," Ziegler would have

been entitled to a "less lucrative" fixed commission on each sale made within a particular territory (whether or not the company itself personally made the sale). Ziegler also would have been relieved of the obligations to carry an inventory of spare parts and to provide certain services. Apart from these points, the two arrangements were quite similar. *Id.* at 10.

Ziegler nonetheless rejected Rexnord's offer, the dealership agreement expired, and Ziegler sued under the WFDL. *Id.* at 9–10. The Wisconsin Supreme Court described the question before it as follows:

The real issue is whether a grantor (as defined in the WFDL) may alter its method of doing business with its dealers (as defined in the WFDL) to accommodate its own economic problems, or whether it must subordinate those problems—regardless how real, how legitimate, or how serious—in all respects and permanently if the dealer wishes to continue the dealership. We find that the grantor's economic circumstances may constitute good cause to alter its method of doing business with its dealers, but such changes must be essential, reasonable and nondiscriminatory.

433 N.W.2d at 11. Ziegler countered with the argument that the language of the WFDL does not permit a grantor to "alter a dealership for economic reasons relating to the grantor only," *id.*—a position consistent with this court's holdings in *Kealey* and *Remus*. See *Kealey*, 761 F.2d at 350; *Remus*, 794 F.2d at 1240. The Wisconsin Supreme Court, over the objections of then-Justice Abrahamson, squarely rejected that interpretation:

This position is unjust and unreasonable. The WFDL meant to afford dealers substantial protections previously unavailable at common law; however, the Wisconsin legislature could not have intended to impose an eternal and unqualified duty of self-sacrifice upon every grantor that enters into a distributor-dealership agreement.... It is obvious from [sec. 135.025(2) of the Act, which defines the purposes and policies of the WFDL] ... that mutual fairness must be present between the grantor and dealer and that the

legislature contemplated possible changes in existing dealership relations. 433 N.W.2d at 11. The Court concluded that "[t]he good cause element may be met if a dealer lacks substantial compliance with the terms of the new contract, provided the altered terms are essential, reasonable and nondiscriminatory. If the grantor is demonstrably losing substantial amounts of money under the relationship, it may constitute good cause for changes in the contract." *Id.* at 12.

The district court acknowledged the centrality of *Ziegler* to Morley–Murphy's claim, but it confined *Ziegler's* holding closely to the facts of that case. *Morley–Murphy Co.*, 910 F.Supp. at 456–58. It found particularly important the fact that in *Ziegler* the grantor offered the dealer an alternative arrangement that would have continued the business relationship between the parties (albeit not as a dealer and thus presumably outside the scope of the WFDL). *Id.* at 456–57. According to the district court, *Ziegler* did not contemplate actual terminations for economic duress, but only "essential, reasonable and not discriminatory" changes to an ongoing relationship. *Id. Here, apart from the token offer of the premium business, Zenith wanted a complete termination of the relationship between the two parties. In the district court's view, it would stretch the language of § 135.02(4)(a) to the breaking point if the statute tolerated market withdrawal as a term that could be imposed for good cause.* Id. *at 457.*

We agree with the district court that one must strain to interpret the WFDL as permitting dealer termination as one form of grantor restructuring. *Cf. Kealey*, 761 F.2d at 350; *Remus*, 794 F.2d at 1240. However, that strain does not arise because of the difference between complete termination and a lesser change in the parties' legal relationship (*e.g.*, from dealer to independent agent). Instead, it is a natural consequence of the Wisconsin Supreme Court's interpretation of "good cause" in *Ziegler.* Then–Justice Abrahamson (joined by then Chief Justice Heffernan) pointed this out to her colleagues in her concurring opinion, where she said that "the interpretation adopted by the majority opinion ignores the plain language of the statute and subverts the legislative intent and purpose underlying the Wisconsin Fair Dealership Law." 433 N.W.2d at 14. By expanding the concept of "good cause" in § 135.02(4) to cover at least some cases in which the grantor's economic circumstances impelled the proposed change, *cf. id.* at 15, the Wisconsin Supreme Court opened the door to grantor arguments like Zenith's for any case falling under § 135.03, which addresses both cancellation and alteration of agreements.

We see nothing in *Ziegler* that limits the concept of "change" to minor alterations that do not disrupt the basic underlying relationship. Like a switch from a dealership to a "tight agency" or a restructuring that leaves only the premium business in the dealer's hands, a termination is surely a "change" in the parties' relationship. Section 135.03 itself does not distinguish, for purposes of the good cause requirement, among actions that "terminate, cancel, fail to renew or substantially change" the dealership agreement. Thus, if Rexnord was entitled to argue that its own economic circumstances constituted good cause for its attempted change and its ultimate termination of Ziegler's dealership, we see no logical reason why Zenith cannot attempt to do the same with respect to Morley–Murphy's dealership. *Cf. East Bay Running Store, Inc. v. NIKE, Inc.*, 890 F.2d 996, 1000 n. 6 (7th Cir.1989) (recognizing, but not deciding, that contrary to what *Remus* held, *Ziegler* seemed to contemplate a grantor-based inquiry).

The Wisconsin Supreme Court was careful to limit this kind of grantor-based good cause, so that grantors would not be able to terminate merely upon a showing that they believed they could make more money without the particular dealer. Instead, the Court held:

The need for change sought by a grantor must be objectively ascertainable. The means used by a grantor may not be disproportionate to its economic problem. What is essential and reasonable must be determined on a case-by-case basis. The dealer is also protected from discriminatory treatment. This requirement preserves a dealer's competitive position in regard to other dealers and effectively discourages a

grantor from acting on improper motives but, because it presumptively requires systemic changes, it tends to reinforce the requirement that the change be essential. 433 N.W.2d at 13. Under this passage, the grantor must therefore show three things in order to justify its proposed change: (1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action. The context of *Ziegler* makes it clear that these criteria apply to all changes, including terminations. We therefore conclude that the district court erred in granting partial summary judgment for Morley–Murphy on liability. The case must be remanded so that Zenith has an opportunity to prove that its particular circumstances qualified as "good cause" under the statute for the steps it took.

### III

In addition to its arguments on liability, Zenith appealed a number of issues about the jury's damages award. Because further proceedings will take place, there is no need for us to address Zenith's claim that the jury's award of lost future profits was not supported by sufficient evidence. On the other hand, two of Zenith's arguments on damages raise questions of law that may be pertinent on remand if a jury finds Zenith did not have good cause to terminate Morley–Murphy: first, its claim that the district court erred in allowing the jury to award damages under the WFDL for Morley–Murphy's loss of profits outside Wisconsin; and second, its claim that the jury's award of Morley–Murphy's out-of-pocket expenses, on top of its award of lost profits, amounted to an impermissible double recovery. With the hope that our attention to these points now may spare the parties and the court even more extended proceedings, we now turn to them.

■ 1. *Out–of–State Profits.* The jury subdivided its entire damages award of $2,374,629 into three parts: $687,647 for out-of-pocket expenses resulting from the nonrenewal of the dealership, $605,590 for lost future profits on projected sales from Morley–Murphy's Wisconsin locations, and $1,081,392 for lost future profits on projected sales from Morley–Murphy's Iowa and Minnesota locations. *Morley–Murphy Co.,* 942 F.Supp. at 421. Zenith argues that the award of damages for losses attributable to Morley–Murphy's future sales in Iowa and Minnesota imposes an unconstitutional burden on interstate commerce, in violation of the Commerce Clause. U.S. Const. art. I, § 8, cl. 3. Zenith claims Wisconsin is penalizing it (a Delaware corporation with its principal office in Illinois) for changing its distribution methods in Iowa and Minnesota, solely because the former distributor is a Wisconsin company. In Zenith's view, this extraterritorial extension of Wisconsin law violates the dormant Commerce Clause and cannot be sustained.

We think Zenith has jumped the gun in an important way when it argues that the WFDL violates the Commerce Clause insofar as it regulates extraterritorially (by allegedly forcing an out-of-state manufacturer to continue using a Wisconsin dealer in states other than Wisconsin). In *Diesel Serv. Co. v. AMBAC Int'l Corp.,* 961 F.2d 635, 642 (7th Cir. 1992), this court recognized "the possible commerce clause problems in allowing [the WFDL] . . . to govern economic activity that [takes] . . . place largely outside of Wisconsin," but it reserved full consideration of that issue for another day. See also *Wright–Moore,* 908 F.2d at 134 n. 2 (same reservation made for Indiana's dealer protection law). Today is that day, with one important qualification. We must initially decide whether, as a matter of statutory construction, the Wisconsin Supreme Court would interpret the WFDL as allowing Zenith to terminate its Wisconsin dealer's contract insofar as it covers Iowa and Minnesota (and the Dakotas, which are not involved in the damages issue) only on pain of paying more than a million dollars in damages—in essence regulating Zenith's dealer relationships extraterritorially. Only if the answer is yes would we have to reach the constitutional question.

The WFDL is silent on the question of its extraterritorial reach, and no Wisconsin court has considered that issue. Nevertheless, just as federal law presumptively applies only within the territorial jurisdiction of the United States, see *EEOC v. Arabian*

*American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 1230–31, 113 L.Ed.2d 274 (1991), we have found in the past that the Wisconsin Supreme Court would take the same approach to a state statute. See *K–S Pharmacies, Inc. v. American Home Prods., Corp.,* 962 F.2d 728, 730–31 (7th Cir.1992), referring to *Consolidated Freightways Corp. v. Wisconsin Dept. of Revenue,* 164 Wis.2d 764, 477 N.W.2d 44 (1991). See also *LaCrosse Queen, Inc. v. Wisconsin Dept. of Revenue,* 208 Wis.2d 439, 561 N.W.2d 686, 694 & n. 5 (1997) (interpretation of tax statute's jurisdiction limited by Commerce Clause) (Abrahamson, J., dissenting); *Glass v. Kemper Corp.,* 133 F.3d 999, 1000–01 (7th Cir.1998) (construing the Illinois Wage Payment and Collection Act, 820 ILCS 115). State courts are no more in the habit of construing state legislation in a way that would violate constitutional limitations than federal courts, and they are well aware that the Supreme Court has held that certain assertions of extraterritorial jurisdiction violate the dormant Commerce Clause. See, *e.g., Healy v. Beer Institute,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). See generally Donald H. Regan, *Siamese Essays: (I)* CTS Corp. v. Dynamics Corp. of America *and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation,* 85 Mich.L.Rev. 1865 (1987).

█ We agree with Zenith that the extraterritorial application of the WFDL would, at the very least, raise significant questions under the Commerce Clause. The Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Oregon,* 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). This negative or dormant aspect of the Commerce Clause "prohibits state taxation ... or regulation ... that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *General Motors Corp. v. Tracy,* 519 U.S. 278, ──, 117 S.Ct. 811, 818, 136 L.Ed.2d 761 (1997) (internal citations and quotations omitted).

█ Among other things, the Commerce Clause invalidates state statutes that "may adversely affect interstate commerce by subjecting activities to inconsistent regulations." *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987); *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 582–84, 106 S.Ct. 2080, 2085–87, 90 L.Ed.2d 552 (1986). It seems to us that just such a risk would arise if the WFDL were construed to apply extraterritorially. It is obviously up to Wisconsin to decide whether it wants a franchise protection law that (at least potentially) imposes additional costs on companies that wish to serve the Wisconsin market, by restricting both their initial choices of distributional strategy and their flexibility in adapting to changes in the market. Wisconsin would gain certain benefits from the protection of Wisconsin dealers, and the costs would largely be passed on to Wisconsin consumers. It is much more difficult to see why Wisconsin is entitled to insist that other states adhere to the same economic policy it has chosen. Suppose, for example, that the Iowa legislature decided it wanted to attract new business to the state, and it enacted a dealership law stating that dealership terminations either had to be for "good cause" or, if not supported by good cause, the effective date of any termination had to be two years after the supplier gave notice of its intent to terminate. The Iowa legislature might think that such a law balanced legitimate franchisee or dealer interests against manufacturer or supplier interests in a better way than the more absolute Wisconsin approach. However, if a Wisconsin distributor has been serving the Iowa market, what is the grantor to do if it wishes to close shop in Iowa (assuming that good cause cannot be shown)? If Wisconsin law applies extraterritorially, Iowa public policy will be thwarted because the Wisconsin distributor cannot be phased out over the two-year period that Iowa has chosen. In fact, any state that has chosen a policy more *laissez faire* than Wisconsin's would have its choices stymied, because the state that has chosen more regulation could always trump its deregulated neighbor.

The Wisconsin legislature specified that the WFDL was to govern all dealerships "to the full extent consistent with the constitutions of this state and the United States," Wis. Stat. Ann. § 135.025(2)(d) (West 1997). We think, in light of both the presumption against extraterritoriality and the troublesome nature of the constitutional questions that would be raised if the WFDL reached beyond Wisconsin's borders, that the Wisconsin Supreme Court would construe the WFDL as not applying to Morley–Murphy's sales of Zenith products in Minnesota and Iowa. (We make no comment here on the evidence supporting the amount the first jury chose for domestic damages, however, because a later jury will consider different evidence.) This means, in turn, that Morley–Murphy cannot make a claim based on the WFDL for lost profits arising out of the termination of its out-of-state dealerships.

Before leaving this subject, we address a similar case in which the Third Circuit concluded that a franchise agreement did apply extraterritorially. Just as we have found it unnecessary to rule definitively on the Commerce Clause point, so did the Third Circuit in *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813 (3d Cir.1994). In that case, the Computer Curriculum Corp. (CCC) entered into a distribution agreement with Instructional Systems, Inc. (ISI) that covered its computer-based integrated learning system. *Id.* at 815. CCC was a Delaware corporation headquartered in California, and ISI was a New Jersey company. *Id.* at 816. Under the agreement, ISI was CCC's exclusive reseller not only for New Jersey, but also for Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, Rhode Island, Vermont, and Washington, D.C. *Id.* The agreement stated that it would continue until July 31, 1989, and that it would be governed by California law. *Id.*

When mid–1989 arrived, CCC decided that it wanted to constrict ISI's agreement because it thought ISI was not marketing its products vigorously enough in some states. *Id.* It offered to continue ISI's authority to distribute in New Jersey, New York, and Massachusetts, but it effectively terminated

ISI for the other states. *Id.* ISI sued under several provisions of the New Jersey Franchise Practices Act (NJFPA). See N.J. Stat. Ann. § 56:10–1 et seq. (West 1997). Because the extraterritorial reach of the New Jersey law was unclear, the federal court abstained under the authority of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and obtained an authoritative ruling from the New Jersey Supreme Court that the NJFPA applied to the ISI–CCC contract, including the out-of-state relationships. *Id.* When the case reached the Third Circuit, that court was asked to decide whether the statute violated the dormant Commerce Clause, insofar as it applied to CCC's termination of ISI for states other than New Jersey. *See id.* at 816–18.

The Third Circuit accepted the New Jersey Supreme Court's decision that the NJFPA applied to the contract, notwithstanding the parties' express choice of California law. *Id.* at 823. It characterized the question before it as a simple one of choice-of-law, finding "nothing untoward about applying one state's law to the entire contract, even if it requires applying that state's law to activities outside the state." *Instructional Systems*, 35 F.3d at 825. That perspective also led it to reject CCC's argument that the NJFPA was a state regulation that had to be treated differently from an ordinary rule of contract law. Because CCC itself decided to confer a franchise on a New Jersey company, and because it awarded a multistate territory to that New Jersey company, the court concluded that any projection of New Jersey law outside of New Jersey's borders was a function of the parties' own choice. It did not think that any other state was likely to impose demands on ISI or CCC that would require them to violate New Jersey law, or vice versa. On that understanding, the court found nothing in the Commerce Clause that invalidated the restriction on CCC's termination of its New Jersey dealer's out-of-state territories. It therefore had no occasion squarely to confront the question whether New Jersey constitutionally could have required out-of-staters to abide by its franchise protection law as a regulatory matter.

We find nothing in the contract between Morley-Murphy and Zenith that could reasonably be called an agreement to abide by the WFDL in states outside of Wisconsin. Recall that the distributorship agreement had a choice-of-law clause that specified Illinois law. This case is therefore not like the one considered by the Fifth Circuit in *C.A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163, 1166 (5th Cir.1977) (per curiam). There, a Wisconsin manufacturer had an agreement with a Georgia dealer, under which the parties chose Wisconsin law. *Id.* at 1164. The Georgia dealer attempted to invoke the WFDL, and the court decided that nothing in Wisconsin law prevented the parties from agreeing to abide by the terms of that law. *Id.* at 1167. No one argued that any mandatory provision of Georgia law overrode the WFDL; thus, the principle of freedom of contract was adequate to dispose of the case. *Cf. id.*

The reasoning in *Instructional Systems* strikes us as somewhat problematic with respect to the question of party autonomy. It appears to us quite odd to speak of party autonomy in a context where the parties are not permitted to opt out of a provision of state law. Nevertheless, whatever the case was in New Jersey, it is clear that in Wisconsin party autonomy plays no role in the applicability of the WFDL for dealers inside the state: the statute expressly provides that its effects "may not be varied by contract or agreement." See Wis. Stat. Ann. § 135.025(3) (West 1997). There is no way that Zenith and Morley-Murphy could have avoided the WFDL without deciding to forego a contract altogether. *See Bush v. National Sch. Studios*, 139 Wis.2d 635, 407 N.W.2d 883, 886–88 (1987) (applying the WFDL despite a choice-of-law clause that specified Minnesota law controlled). Thus, on these facts the approach of *Instructional Systems* does not support a WFDL-based right to profits for Morley-Murphy's loss of its out-of-state business. We therefore hold that, on remand, the district court must exclude from the profits recoverable under the WFDL any amounts attributable to the termination of Morley-Murphy's right to serve states other than Wisconsin.

2. *Out–of–Pocket Expenses.* Last, we consider Zenith's claim that Morley–Murphy's recovery of certain out-of-pocket expenses as well as its lost profits amounts to an impermissible double recovery. As indicated earlier, the jury's award included $687,647 for out-of-pocket expenses resulting from the nonrenewal of the dealership. Zenith concedes that Morley–Murphy's expert witness on damages properly testified at trial that $255,647 of this amount reflected compensable out-of-pocket expenses such as severance pay and inventory return costs—in other words, commercially reasonable expenses incurred entirely because of Zenith's termination. *Cf.* U.C.C. §§ 2–710, 2–715(1) (incidental damages). To the extent the jury awarded an additional $432,000, however, Zenith argues that this portion represents Morley–Murphy's fixed costs such as executive compensation and office space, which it says are costs that would have been incurred regardless of the termination. Zenith argues, citing *Patton v. Mid–Continent Sys., Inc.*, 841 F.2d 742, 748 (7th Cir.1988), that Morley–Murphy would reap a double recovery if it received these expenses on top of lost profits. Morley–Murphy responds that the Wisconsin Supreme Court has permitted recovery of both lost profits and "overhead or fixed expenses" that remain constant regardless of whether the contract is performed. See *Schubert v. Midwest Broadcasting Co.*, 1 Wis.2d 497, 85 N.W.2d 449, 452–53 (1957).

This is a place where broad labels, such as "lost profits" and "out-of-pocket expenses," can be misleading. The instructions the trial court gives on remand must take care to define what is included (and what is excluded) from the "lost profits" item, which in turn will take care of the "out-of-pocket" expenses (as Morley–Murphy is using this term). An award of "lost profits" should represent the amount of money equal to the net gain the plaintiff would have received if the contract had not been breached. See generally Russell M. Ware, 3 *The Law of Damages in Wisconsin* § 26.4 (2d ed.1997). Here, if Morley–Murphy had continued as a Zenith distributor, it would have sold a certain number of television sets and other electronic products, which would have yielded a certain gross sum of money. From that, it

would normally have subtracted its variable costs attributable to the Zenith line, to come up with a net profit figure; at some later time, it would have paid its fixed costs for the entire business from its aggregated revenues. It is the latter adjustment that causes conceptual difficulties. The fixed costs that should be allocated to a particular account are not easy to determine with precision when, as here, the injured party carries a number of different manufacturers' products. (A similar problem arises in predatory pricing cases in the antitrust area, when courts try to figure out whether an alleged monopolist is selling a product below cost. The difficulty of the task in that area has led the Supreme Court to embrace an easier test for many predatory pricing claims, under which the threshold question is whether the defendant could ever recoup losses from below-cost pricing through the long-term prospect of monopoly profits. See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224–27, 113 S.Ct. 2578, 2588–90, 125 L.Ed.2d 168 (1993).)

Zenith's alleged breach caused two different kinds of harm to Morley–Murphy: it lost its net profits from its Zenith account, and the Zenith account was no longer available to help defray its fixed costs of doing business. Two variants of a hypothetical example may clarify this point. Suppose Morley–Murphy had the following cost data while the contract was still in effect:

A. "Lost profits" net of both fixed and variable costs

| | |
|---|---|
| $100,000 | revenues from TVs sold for Zenith |
| − 55,000 | cost of goods sold −20,000 variable cost of distribution (salaries, warranties, etc.) |
| − 15,000 | share of fixed costs attributable to Zenith business |
| $10,000 | fully allocated net profits |

B. "Lost profits" net of only variable costs

| | |
|---|---|
| $100,000 | revenues from TVs sold for Zenith |
| − 55,000 | cost of goods sold |
| − 20,000 | variable costs of distribution |
| $ 25,000 | net profits assuming no contribution to fixed costs |

As we said before, Morley–Murphy's damage award should put it in the same position it would have been in if there were no breach. If we define "lost profits" as it is done in example A and limit the award to $10,000, then Morley–Murphy would be undercompensated for the breach. This is because the $15,000 from the Zenith business that it allocated to fixed costs is also lost by the breach, it is not captured by any other theory of damages, and by definition none of the fixed costs could be avoided because of the breach. If, on the other hand, we define "lost profits" as it is done in example B, then an additional award of the $15,000 for a contribution to fixed costs would plainly amount to a double recovery. See also *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 618 (3d Cir.1989) (similar tabular example).

Wisconsin follows the rule that costs "avoided" as a result of the breach are to be subtracted from revenue when calculating "lost profits," see generally Michael A. Bowen & Brian E. Butler, *The Wisconsin Fair Dealership Law* § 12.5 (2d ed.1997), and, by the same token, that no offset is appropriate for fixed costs, see *Schubert*, 85 N.W.2d at 453. This suggests to us that Wisconsin defines the term "lost profits" along the lines of our example B, which means that the plaintiff is entitled to recovery of profits net of avoidable costs only. The court should not *also* allow recovery of the fixed costs (equivalent to the $15,000 in our example), because the lost profit award has already put the company in the same position it would have enjoyed if the contract had been performed: it has its profits net of avoidable costs, and it can use all or part of that sum to defray fixed costs. (An important advantage of using this approach is that it avoids the need to calculate exactly what proportion of its fixed costs it would have paid from its Zenith earnings, as opposed to from other sources of income.) This is consistent with both *Schubert* and our decision in *Patton*, which ruled out recovering certain avoidable franchisee fees and rental payments on the ground that the lost profits award there already accounted for them. On remand, if matters reach this point, the district court should instruct the jury along the lines we have described here.

The decision of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.